# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PRINCIPAL LIFE INSURANCE** | : | |
| **COMPANY,** | : | **Civil Action No. 1:08-CV-2294** |
| | : | |
| **Plaintiffs,** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARK DeROSE and** | : | |
| **MATTHEW DEROSE,** | : | |
| **as Trustees of the JoAnn DeRose** | : | |
| **Family Trust, and** | : | |
| **FIRST PRIORITY BANK,** | : | |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

This is an action brought by Principal Life Insurance Company ("Principal" or "Plaintiff") seeking entry of a judgment declaring that, <u>inter alia</u>, Principal's obligations under three polices of insurance issued on the life of JoAnn DeRose were not procured for legitimate purposes, or were obtained through fraudulent misrepresentations.  Specifically, Principal alleges that the Trustees of the JoAnn DeRose Family Trust purchased the policies as part of a so-called stranger originated life insurance ("STOLI") scheme, and that the non-recourse premium financing that the Trustees used to pay for the premiums on the policies was concealed from Principal during the application process.  For this reason, Principal commenced the

instant action seeking a declaration that the DeRose policies are void due to a lack of insurable interest at inception, or on the basis of certain material misrepresentations made during the application process.  (Compl. at ¶¶ 32-38.)

Although the litigation was commenced against the Trustees alone, and although the Trustees continued to litigate this matter against Principal after the action was initiated, on June 29, 2010, the Court entered an order permitting the intervention of First Priority Bank as a defendant in this action.  (Doc. 90.)  First Priority Bank is the financial institution that financed the premiums that the Trust paid under the policies, and which holds a first priority lien against the policies.  After the Trustees failed to pay a scheduled premium payment on the policies in or around April 2010, First Priority determined that its security interest in the policies was in jeopardy, and thereafter continued to make payments on the premiums required to keep the policies in force and protect its security interest.

Following an additional period of discovery after First Priority intervened, the Trustees and First Priority Bank filed separate motions for summary judgment on Principal's claims.  (Docs. 104, 114.)  Principal has filed a single brief in opposition to both motions, urging that disputed issues of material fact exist with respect to its single claim that the insurance policies at issue in this case are impermissible and voidable because they are STOLI schemes.  Plaintiffs have filed reply briefs in further

support of their respective motions, which are now ripe for disposition.  Upon review of the record compiled by the parties in support of and opposition to the pending motions, and following careful review of the briefs supported by all parties, we will recommend that the motions for summary judgment be denied.[1]

## II.   FACTUAL BACKGROUND

### A.   The Rise of STOLI Transactions.

Over the past decade, the secondary market for life insurance has been experiencing a period of growth.  Another district court within the Third Circuit summarized this burgeoning secondary life insurance market this way:

> [There is] a growing cottage industry in the insurance market, known as stranger-owned life insurance policies or "STOLI" plans, in which an individual, typically an elderly one, procures life insurance on his own life in order to subsequently assign the policy to a third party following the lapse of the two-year contestability period.  STOLI transactions are the product of the burgeoning "life

---

[1] The pending motions for summary judgment have inspired two related motions.  In the first, the DeRose defendants moved to supplement the record in support of their motion for summary judgment.  (Doc. 152.)  Agreeing that the supplementary materials "actually shed[] light on the issues in this case," but disagreeing entirely as to the evidentiary significance of the materials, Principal concurred in the motion to supplement the record.  (Doc. 156.)  Accordingly, we will enter a separate order granting this motion as unopposed.  In addition, First Priority has moved for entry of an order staying the bank's obligation to continue making premium payments on the policies pending the conclusion of the lawsuit. (Doc. 172.)  We will address this motion in a separate order to be issued subsequently.

settlements" market, in which insureds sell unneeded or unaffordable permanent policies to investors. . . .

A typical STOLI transaction is structured as follows. An agent attempts to sell a life insurance policy to an elderly insurable candidate, and offers the candidate immediate up-front cash in exchange for promising a future sale of the policy. The agent informs the candidate that the candidate will be able to obtain the policy at virtually no cost to himself, because the agent has secured non-recourse financing to purchase the policy. The candidate then acts as a "nominal grantor" of a life insurance trust that is used to apply for the policy. "At that time the agent will tell the insured that, in all probability, the policy will be sold to investors for a price that will pay the loan and accrued interest, leaving a profit to split between the agent and the insured. . . . If the insured survives [the two-year contestability period on the policy], the owner (the life insurance trustee) typically has two options: (1) have the insured pay the outstanding debt with accrued interest and retain the policy; or (2) transfer the policy to the lender in lieu of foreclosure."

Lincoln Nat'l Life Ins. Co. v. Calhoun, 596 F. Supp. 2d 882, 884-85 (D.N.J. 2009) (quoting J. Alan Jensen & Stephan R. Leimberg, Stranger-Owned Life Insurance: A Point/Counterpoint Discussion, 33 ACTEC J. 110 (2007)).

Along with the rise in this secondary market, insurers like Principal Life Insurance grew concerned that many of the policies that were being purchased were not being procured for legitimate needs, but instead for improper wagering on the lives of strangers, and to satisfy investor demand. To address this growing concern, on January 30, 2006, Principal officially announced that the company did not support

any form of STOLI, "including non-recourse premium financing . . . as these are almost always tied directly or indirectly to a sale to an investor group." (Doc. 121, Ex. A, January 30, 2006 STOLI Bulletin.)  At the same time, Principal advised its brokers that the life insurance application process would include questions about the use of "premium financing and intended changes of ownership." (Id.)

## B.    The DeRose Policies

Against this background, on December 5, 2006, an application was submitted to Principal for policies insuring JoAnn DeRose's life in the amount of $25 million. (Doc. 121, Ex. B.)  The application indicated that the beneficiary of the DeRose policies would be the JoAnn DeRose Family Trust. (Id.)  The co-trustees of the Trust were to be Mrs. DeRose's sons, Mark DeRose and Matthew DeRose. (Id.)  The application listed Ronald Perry, a lawyer and independent broker who was authorized at the time to sell life insurance policies for Principal, as the party who sold the policies to DeRose.[2] (Id.)  At that time, Perry was associated with a company called Total Financial Solutions, and was affiliated with a business group named Delaware Financial Group ("DVFG"), which marketed and sold insurance and financial

---

[2] Mr. Perry is an estate planning attorney with a practice located in York, Pennsylvania. (Doc. 123, Ex. C, Perry Dep. at 12-16.)  Perry met Mrs. DeRose in 2002, when he settled the estate of Martin DeRose, Mrs. DeRose's late husband. (Id., at 10, 34-35.)

products for Principal.  (Doc. 123, Ex. C, Dep. of Ronald Perry, at 19-21, 31-32.)  As part of his work at DVFG, Mr. Perry was subject to the terms of a broker agreement that required Mr. Perry and other brokers to comply with Principal's instructions and directives.  (Doc. 123, Ex. D.)  These contracts provided, *inter alia*, that Principal brokers must "[c]onform to and comply with all laws pertaining to insurance and insurance brokers," and must "[c]onform to and comply with all of [Principal's] policies and procedures regarding the marketing of [its] policies."  (Id.)

In keeping with Principal's developing concern about life insurance policies being procured for the resale on the secondary market rather than for legitimate insurance purposes, Principal required JoAnn DeRose and Ronald Perry to submit a Policy Owner Intent ("POI") form as part of the application.  (Doc. 123, Ex. E, Policy Owner Intent signed December 5, 2006.)  On the POI, DeRose was asked the following two questions:

1. Is there an intention that any group of investors will obtain any right, title, or interest in any policy issued on the life of the Proposed Insured(s) as a result of the policy applied for?

2. Will you borrow money to pay the premiums for this policy or have someone else pay these premiums for you in return for an assignment of policy values back to them?

(Id.)  DeRose and Perry checked the "yes" box in response to each of these questions, and provided a written explanation for each answer.  The first explanation states that

"She has policies on her life owned by her children and also policies owned by Irrevocable Trusts.  This policy is in place for the benefit of her grandchildren." (Id.) With respect to the second question, the explanation stated that "She is making gifts to Irrevocable trust for the benefit of the grandchildren.  The trust will pay the premiums." (Id.)

In addition to the application and POI, DeRose and Perry provided Principal with a check in the amount of $245,087.50, which was the amount due for the first quarter of premium under the policies.  (Doc. 123, Ex. G, December 22, 2006 Memorandum and Check.)  The check was drawn on an escrow account that belonged to Perry, who was identified as DeRose's estate planning attorney.  (Id.)  According to Principal, the fact that the check came from Perry's attorney escrow account suggested that DeRose was, and would remain, the source of premium payments under the policies.  (Doc. 121, at 5.)

Joanie Cherrier is the underwriter who reviewed DeRose's initial application for the policies.  (Doc. 123, Ex. H, Dep. of Joanie Cherrier, at 6-7.)  During her deposition, Ms. Cherrier testified that after reviewing the explanations that Mrs. DeRose and Mr. Perry provided on the POI, she believed that both parties misunderstood the questions.  (Id., at 71-72, 91-92, 99.)  According to Ms. Cherrier, she believed that DeRose was simply explaining the purpose of the life insurance

policies at issue, and that the policies were not, in fact, intended to be re-sold on the secondary market. (Id., at 71-77.) Moreover, Ms. Cherrier did not believe that premium financing was going to be used to finance the policies' purchase. (Id., at 98-99.)

Shortly after filing the initial application for $25 million in life insurance, on December 22, 2006, Mrs. DeRose requested that the amount of insurance coverage be increased to $35 million, and that the total amount of coverage be split among three policies. (Doc. 23, Ex. I, December 21, 2006 Panai Email and December 22, 2006 New Business Cover Sheet.) DeRose's application was approved. (Doc. 123, Ex. H, Cherrier Dep. at 117, 130, 137, 147-48, 159.) Thereafter, on December 27, 2006, Principal issued three policies insuring JoAnn DeRose's life; two of the policies had a face value of $12.5 million (Policy Nos. 6076175 and 6076176), and one had a face amount of $10 million (Policy No. 6075463). The policies were to be placed in force after the delivery requirements, including a signed delivery receipt and payment of premium due, were returned to Principal's home office. (Doc. 124, Ex. L.)

One month later, on January 22, 2007, a team leader for DVFG, Michele Madden, contacted Erik McMaster in Principal's home office to tell him that she had sent the delivery requirements to Principal on January 19, but that she had made a

"huge mistake" by doing so.  (Doc. 124, Ex. M.)  In her email, Madden indicated that the delivery requirements had been sent prematurely, and an agent was following up with DeRose because of lingering questions about the applications.  (Id.)  Principal accommodated Madden's request that the delivery requirements be marked pending. Following a brief delay, the delivery requirements were returned to Principal on February 15, 2007, and the policies were placed in force.[3]  (Doc. 124, Ex. N.)

### C.    Financing for the DeRose Policies

Although there had been some confusion over Mrs. DeRose's answers and explanations provided on the POI, it now appears to be undisputed that the DeRose parties were always intending to use non-recourse premium financing to allow the Trust to obtain the $35 million in insurance policies.  Thus, on November 11, 2006, approximately one month before Mrs. DeRose and Mr. Perry initially requested $25 million in life insurance, an application for non-recourse premium financing was submitted on DeRose's behalf to Coventry, a premium finance lender.  (Doc. 124, Ex.

---

[3] Notably, Mrs. DeRose testified during her deposition in this action that she had almost no personal knowledge regarding the policies that she applied for insuring her life, and that she was unaware of having purchased life insurance through Ronald Perry or DVFG.  (Doc. 123, Ex. F, Dep. of JoAnn DeRose at 49, 69-70, 93.)  This is perhaps not surprising, given Mrs. DeRose's testimony that she had no personal involvement in completing the applications, and her handwriting is not on any of the application documents or the POI.  (Id. at 94-95, 112-13.)

9

P.)  Mrs. DeRose signed this application as the borrower and the proposed insured under the policies.  (Id.)  In addition, the application was signed by Marc Smith, a broker affiliated with DVFG, and contained a handwritten note on the top of the first page that states "$35 million" – the amount of insurance ultimately purchased.  (Id.)  This information was never disclosed on the POI.

While the application for insurance was pending, Ronald Perry, the York County attorney advising the DeRoses, created an irrevocable life insurance trust that would own the policies.  (Doc. 124, Ex. Q, JoAnn DeRose Irrevocable Family Trust Agreement.)  The trust was created under Pennsylvania law.  (Id., Article XVIII.)  On December 18, 2006, Coventry approved a non-recourse loan in the amount of $1,158,628.00, which would be sufficient to pay for two years of premiums under the policies.  (Doc. 124, Ex. R.)  The loan was to be secured by the policies or a beneficial interest in a statutory trust that held the policies.  (Id.)

For reasons that are not clear in the parties' briefs and factual statements, a decision was ultimately made not to use Coventry to fund the insurance premiums, but to look instead to First Priority Bank as a potential lender.  On February 22, 2007, DVFG closed on a loan transaction with First Priority, seven days after the delivery requirements were returned to Principal, placing the policies in force.  Under the terms of the parties' agreement, First Priority loaned the DeRose trust $1,515,000.00,

which would provide for 27 months of premiums, a loan commitment fee payable to First Priority, and 27 months of interest payments payable to First Priority over the 27-month period. (Doc. 124, Ex. U, Loan and Security Agreement; Ex. T, Dep. of Jane Gardner, at 50-53.) The loan agreement provided for an interest rate of 15.25%, but the amount was to be capitalized and be repaid at the end of the loan. (Doc. 124, Ex. U; Ex. T, Gardner Dep. at 50.) First Priority also established an interest reserve account, controlled by First Priority representatives, which held the interest reserve and escrow amounts, and out of which First Priority paid itself interest payments as they became due under the terms of the loan. (Doc. 124, Ex. T, Gardner Dep. at 50.)

First Priority agreed to loan the DeRose Trust the money necessary to pay the insurance premiums despite never having met JoAnn DeRose, without requiring Mrs. DeRose to post any collateral to secure the loan, and without having made any determination of whether the trust could repay the loan at maturity. (Id. at 30, 36, 61-62, 173; Ex. U, at 7; Ex. Y, Dep. of Hahn Tieu, at 17-18; Ex. Z, Dep. of Thomas Miller, at 29.) The only collateral that First Priority could look to in the event of a default under the loan agreement were the assets held by the trust – namely, the three policies insuring DeRose's life.

The credit approval memorandum that was prepared in connection with the First Priority loan seems explicitly to recognize this. Thus, the credit approval

11

memorandum notes that "[t]he principal repayment is the sale of the assigned life insurance policies in the secondary market, via a life settlement transaction (or LS)." (Doc. 123, Ex. W, at 6.)[4]  The memorandum also observed that the bank was relying upon the Corporate Planning Group ("CPG") to market and sell the Principal insurance policies in the secondary market; in the event that the policies could not be sold, CPG guaranteed First Priority Bank repayment of the loan.[5]  (Id.; Ex. AA, Guaranteed Purchase Contract.)  CPG was designated as the exclusive broker for purposes of marketing and selling the policies, (Doc. 124, Ex. CC), and DVFG, Perry, and CPG had an arrangement pursuant to which CPG would retain 35% of any commission generated in connection with resale of the policies, while Perry and DVFG were to retain 65% of the commissions, (Doc. 124, Ex. DD, Letter dated May 11, 2007).  The credit approval memorandum does not include any assessment, or expectation, that the trust would ever undertake responsibility for repaying the loan

---

[4]  The credit approval memorandum found a sale on the secondary market – something considered to be "[t]he ultimate source of repayment" – was likely, given a "[s]trong secondary market for life insurance policies." (Doc. 124, Ex. W, at 3.)

[5]  The price that CPG agreed to pay as part of its guarantee was the amount of indebtedness under the loan at that time.  (Doc. 124, Ex. BB.)

that would be used to purchase the policies and finance their premiums for a period of more than two years.[6]

### III.   STANDARD OF REVIEW

Federal courts are permitted to summarily adjudicate an action in order to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a jury trial would, therefore, "be an empty and unnecessary formality," Peynado v. Sabol, No. 09-355, 2010 U.S. Dist. LEXIS 134131, 2010 WL 5300563, at *2 (M.D. Pa. Dec. 20, 2010). Rule 56 specifically provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a

---

[6] Indeed, the credit approval memorandum found it unlikely that the trust would ever be in a position to repay the loan through proceeds from the policies in the event Mrs. DeRose were to die before the loan term expired. (Doc. 124, Ex. W, at 2) ("Payment of the death benefit upon the death of the insured [is a potential source of repayment], although this is considered unlikely during the term of the proposed loan based on the life expectancy of the insured.")

material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the Court must "consider

all evidence in the light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

## IV.   **DISCUSSION**

The crux of this case is Principal's contention that the insurance policies issued to the Trustees, which are now being held by First Priority, should be declared void *ab initio* "(1) due to a lack of insurable interest at inception and/or (2) material misrepresentations in the application." (Compl., ¶ 1.) The Trustees and First Priority hotly contest Principal's assertions in this regard, and in their briefs supporting the pending motions for summary judgment argue that the Court should grant judgment in their favor because Principal has failed to adduce any evidence to support its argument that the Trustees lacked an insurable interest in the policies at their inception.  In addition to arguing that Principal has failed to come forward with sufficient evidence, the Trustees and First Priority emphasize that the Trustee's never actually sold the policies at issue, but instead only forfeited them to First Priority after the expenses of defending this litigation persuaded them that it was no longer prudent to continue paying the substantial premiums required to keep the policies in place. In summary, Defendants argue that Principal's claims in this case fail as a matter of law because (a) an insurable interest existed at inception of the policies, (b) no

misrepresentation occurred and Principal should be estopped from claiming that it did, and (c) Principal has waived its arguments against enforcement of the policies.

Principal responds by arguing that substantial evidence exists – much of it from First Priority's own files – suggesting that the policies at issue were purchased with the intent to resell them on the secondary market, rather than for legitimate insurance purposes. Principal notes that although Pennsylvania law permits good-faith assignments of insurance policies to parties with no insurable interest in the insured, Pennsylvania continues to require that there be a valid insurable interest at the inception of the policies.

Principal argues that the question of whether a valid insurable interest existed at inception is dependent upon the intent of the parties. In this case, Principal contends that there is, at minimum a dispute of fact as to whether a valid insurable interest existed at inception, and Principal maintains that the financing and internal documents from First Priority associated with the insurance policies provide strong evidence that the parties at all times intended to sell the policies on the secondary market, and that no valid insurable interest existed at the time the policies went into force. Principal also argues that there were a number of misrepresentations made during the application process that cannot be attributed to Principal or its agents, and that these misrepresentations were intended to mislead Principal about the true intent

16

of the insured parties and First Priority.  Finally, Principal asserts that it has not waived its rights to seek a declaration that the policies are invalid, and that it is properly seeking to retain the premiums received for the policies while simultaneously seeking to have the policies set aside.

Because we find that substantial issues of fact remain in dispute about the central issue in this case – whether an insurable interest existed at inception – we will recommend that the Court deny Defendants' motions for summary judgment and permit this matter to proceed to trial for resolution by a factfinder.  Additionally, we find that disputes of fact remain with respect to whether Defendants made material misrepresentations during the application process and, if so, whether Principal bears any responsibility for these misrepresentations.

### A.   Insurable Interest: Pennsylvania Law

It has long been the case that there must exist a valid insurable interest at the inception of a life insurance policy, and that a policy lacking an insurable interest at inception is void *ab initio*.  3 Couch on Insurance 3d, § 41:19 (2005).  In 1881, the United States Supreme Court was confronted by a case which demonstrates that the use of life insurance for improper wagering on the secondary market has long existed, and provides a seminal explanation about the law of insurable interest.  In that case, Warnock v. Davis, 104 U.S. 775 (1881), an individual purchased a $5,000 policy to

17

insure his own life, and on the day he purchased the policy he entered into an agreement with a third party, a trust, which had no insurable interest in the insured's life. In Warnock, the trust agreed to pay the premiums necessary to keep the policy in place, and at the time of the insured's death, the trust would keep nine tenths of the policy benefit. In holding that this arrangement violated the insurable-interest requirement, the Supreme Court explained:

> [I]n all cases there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the assured. Otherwise the contract is a mere wager, by which the party taking the policy is directly interested in the early death of the assured. Such policies have a tendency to create a desire for the event. They are, therefore, independently of any statute on the subject, condemned, as being against public policy.

Id. at 789. Indeed, the Supreme Court not only required that an insurable interest exist at the time of inception, but also held that the assignment of a policy to a disinterested third party was also against public policy, regardless of whether an insurable interest existed when the policy was procured. Id.

In a subsequent decision that recognized that life insurance had become part of many Americans' investment and financial planning, the court reversed Warnock insofar as the case held that the assignment of legitimately purchased policies also

violated public policy.  See Grigsby v. Russell, 222 U.S. 149, 156 (1911).  Although

the court narrowed Warnock, it did not abrogate the common-law requirement that

an insurable interest exist at the time of inception.

In 1951, the Pennsylvania legislature amended the Insurance Company Law to

permit good-faith assignments, in response to a decision by the Pennsylvania

Supreme Court that held even good-faith assignments were impermissible.[7]  40 P.S.

§ 512.  Accordingly, § 512, as amended, provides as follows:

> Any person may insure his own life for the benefit of any
> person, copartnership, association, corporation, or trustee
> of a trust . . . , but no person shall cause to be insured the
> life of another, unless the beneficiary named in such policy
> or agreement of life insurance, whether himself or a third
> person, has an insurable interest in the life of the insured.
> If a policy of life insurance has been issued in conformity
> with this section, no transfer of such policy or any interest
> thereunder shall be invalid by reason of a lack of insurable
> interest of the transferee in the life of the insured or the
> payment of premiums thereafter by the transferee.  The
> term "insurable interest" is defined as meaning, in the case
> of persons related by blood or law, an interest engendered
> by love and affection, and, in the case of other persons, a
> lawful economic interest in having the life of the insured
> continue, as distinguished from an interest which would
> arise only by the death of the insured.

40 P.S. § 512.

---

[7] See Werenzinski v. Prudential Ins. Co. of America, 14 A.2d 279, 280-81
(Pa. 1940).

**B.      Questions of Fact Exist as to Whether an Insurable Interest Existed at the Inception of the Policies.**

Defendants argue that the policies cannot be set aside for lack of an insurable interest because the trust had an insurable interest under Pennsylvania law at the time the policies were procured.  Indeed, Defendants note that the trust held the policies for roughly two years until Principal belatedly sought to invalidate them through this declaratory action, and until the cost of defending this litigation persuaded or forced the trust to default on its loan obligations and surrender the policies to First Priority. First Priority and the Trust maintain that the existence of the insurable interest at the time of inception is clear under these facts, and the policies should not be declared void even if, as Principal argues, the trustees may have considered, at some time, potential assignment of the policies.

In response, Principal urges the Court to find that summary judgment is inappropriate because disputed questions of fact exist regarding Defendants intentions with respect to the insurance policies at the time of inception.  In furtherance of this argument, Principal has identified a number of cases addressing the insurable interest doctrine in the STOLI context, where courts have concluded that the existence of an insurable interest is governed by the parties' intention. Although Principal marshals a number of factual arguments that it claims shows

conclusively that the Defendants always intended to assign the policies insuring Mrs. DeRose's life, and that this intention was clear even before the policies were procured, Principal argues that, at minimum, questions remain regarding the parties intentions that make summary judgment unwarranted.

We have considered the cases identified by the parties, and are persuaded that substantial questions of fact remain as to whether an insurable interest existed at the time of the inception of the policies that militates against granting Defendants' motions for summary judgment.  Although we recognize and appreciate Defendants arguments in support of their position that an insurable interest did exist, and continued to exist following inception of the policies, we also find that there are questions about Defendants' intentions regarding the policies that make it impossible to resolve Defendants' motions in their favor as a matter of law on summary judgment.  Instead, these questions of motive and intent define disputed factual issues which preclude summary judgment.

As an initial matter, we note that a growing number of courts appear to have found that whether an insurable interest exists at inception is governed by the parties' intentions.  See, e.g., Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust, 735 F. Supp. 2d 130, 139 (D. Del. 2010) (concluding that "a pre-negotiated agreement to transfer the beneficial interest in the Policy, but for which [the insured] would not

have applied.  Regardless of whether [the insured] knew the identity of the future purchaser, he clearly intended to sell the beneficial interest in the Policy at the time it was procured"); PHL Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Trust, No. 08-572, 2010 WL 2539755, *4-5 (D. Minn. Mar. 3, 2010); Life Prod. Clearing, LLC v. Angel, 530 F. Supp. 2d 646, 653 (S.D.N.Y. 2008) ("Only one who obtains a life insurance policy on himself 'on his own initiative' and in good faith – that is, with a genuine intent to obtain insurance protection for a family member, loved one, or business partner, rather than an intent to disguise what would otherwise be a gambling transaction by a stranger on his life – may freely assign the policy to one who does not have an insurable interest in him"; "For a court to assess whether a policy was procured 'with a view to its immediate assignment,' it considers the intent of the insured who transfers the policy at the time the policy is procured"); cf. Sun Life Assur. Co. v. Moran, Nos. 08-629, 08-632, 2009 U.S. Dist. LEXIS 76289, *11 (D. Ariz. Aug. 11, 2009) (denying insured's motion to dismiss and observing that "[i]n addition to circumstances where an initial beneficiary lacks an insurable interest, the Ninth Circuit, and other courts, have construed the 'insurable interest' requirement to likewise be violated when the insured is working together with an assignee to acquire an insurance policy where the circumstances indicate that the assignee is the real purchaser of the policy").

Although the above cases all arise outside of Pennsylvania, we nevertheless find them to be persuasive that the parties' intentions with respect to the procurement, and intended disposition, of life insurance policies is relevant to the question of whether a genuine insurable interest existed at inception.  In finding these cases relevant to our evaluation of the pending motions, we are also mindful that there seems to be little evidence in the record to show that Defendants had identified a third-party stranger to the life insurance policies who intended to purchase the policies, and we note that the policies have never been sold.

Some courts seem to have required that "the identity of the stranger third party in a STOLI case be identifiable in order to indicate, at minimum, the existence of bilateral intent."  See Sun Life Assurance Co. of Canada v. Berck, 719 F. Supp. 2d 410, 418 (D. Del. 2010).  See also Sun Life Ins. Co. of Canada v. Paulson, 2008 WL 5120953, at *4 (D. Minn. Feb. 15, 2008) ("Paulson's intent is irrelevant without facts . . . suggesting that a third party lacking an insurable interest intended, at the time Paulson procured the [policies], to acquire the[m] upon expiration of the contestability period.").

We are also mindful that last fall, a divided panel of the Court of Appeals of New York narrowly construed New York's analogue statute to § 512 to permit "a person to procure an insurance policy on his or her own life and immediately transfer

it to one without an insurable interest in that life, even where the policy was obtained for just such a purpose." See Kramer v. Phoenix Life Ins. Co., 940 N.E.2d 535, 536-37 (N.Y. 2010). However, our review of the majority's opinion in Kramer does not persuade us that it is dispositive of our analysis of Pennsylvania's statute, or the facts of this case, many of which remain in dispute or are incapable of clear resolution on the pending motions. Moreover, we instead find that to embrace the Kramer majority's reasoning would essentially amount to a finding that § 512 not only permits free assignability – which it clearly does – but also that it abolished the insurable interest requirement that appears to have developed specifically to avoid having policies procured as part of wagering schemes by those with no interest in the insured's life. We find that the Kramer majority's reasoning is an inadequate basis to predict that the Pennsylvania Supreme Court would similarly interpret the insurable interest requirement included in § 512 of Pennsylvania's Insurance Code.

Upon careful consideration of the parties' competing positions, we find that the parties' intentions with respect to the policies is relevant to a determination of whether an insurable interest existed at the time of inception, and that disputed issues of material fact in this case preclude a dispositive determination of that issue on summary judgment. We also decline to embrace Defendants' argument that because Plaintiff has not come forward with evidence of an identifiable third party who was

expected to become the holder of the policies that the policies cannot be set aside for

lack of insurable interest.  We appreciate Defendants' argument that an insurable

interest existed at inception by virtue of the Trust's interest in JoAnn DeRose's life,

and that the trust's continued interest in Mrs. DeRose's life is evident by the fact that

the Trust never assigned the policies to a third party purchaser.  Indeed, these facts

may cause a factfinder to conclude that Defendants had an insurable interest at

inception, and that the policies are not void for lack of insurable interest.[8]  By the

same token, we find relevance and force in Principal's arguments that the factual

circumstances surrounding the purchase of the policies in this case, and the financing

of them, suggests that the policies were purchased not as part of a legitimate

---

[8] We observe that the cases that Principal relies upon in support of its position that the policies should be declared void involved an actual sale or assignment of the policy at issue.  See, e.g., Wuliger v. Mfgs. Life Ins. Co., 567 F.3d 789, 790 (6th Cir. 2000) (policies immediately assigned); Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust, 735 F. Supp. 2d 130, 140 (D. Del. 2010); PHL Variable Ins. Co. v. Morello 2007 Irrevocable Trust, No. 08-572, 2010 WL 2539755, *3 (D. Minn. Mar. 3, 2010) (policy sold one month after issuance); Sun Life Assur. Co. v. Moran, Nos. 08-629, 08-632, 2009 WL 2450443, *1 (D. Ariz. Aug. 11, 2009) (policy sold months after it was issued); Life Product Clearing, LLC v. Angel, 530 F. Supp. 2d 646, 647 (S.D.N.Y. 2008) (policy sold six days after issuance).  As noted, in the case before the Court, the policies have never been sold, although it does appear clear that they were being marketed by CPG.  This fact may have relevance to an ultimate determination about the parties' intentions, but we do not find it to be dispositive of this issue on summary judgment.

insurance objective, but as part of an unlawful wagering transaction that is impermissible under Pennsylvania law.

Because we find that these factual issues cannot be resolved on summary judgment we will recommend that the Court deny Defendants' motions for summary judgment on the issue of whether an insurable interest existed at inception.

### C.   Unresolved Questions of Fact Exist Regarding Alleged Misrepresentations Made During the Application Process.

Principal has also sought to have the policies declared void on the basis that misrepresentations were made on the application and POI.  In response, Defendants argue that no misrepresentations were made, and that Principal should be estopped from claiming that any misrepresentations occurred on the grounds that the misrepresentations were known by Principal's agents or employees who helped facilitate the insurance and loan transactions.  Principal contends that to the extent First Priority Bank is attempting to attribute misrepresentations to Principal under an agency theory, questions of fact exist as to whether Ronald Perry was acting as Principal's agent, whether he was acting within the scope of his authority, and whether he was acting in conformity with, or in contravention of, Principal's express directives.

The parties initially disagree about whether there were any misrepresentations made on the POI that accompanied the application for insurance. The first question on the POI asked the applicant whether "there [was] an intention that any group of investors will obtain any right, title, or interest in any policy issued on the life of the Proposed Insured(s)." (Doc. 123, Ex. E.) Although the answer given to this question was "yes," the answer was accompanied by an explanatory statement that "[Mrs. DeRose] has policies on her life owned by her children and also policies owned by Irrevocable Trusts. This policy is in place for the benefit of her grandchildren." (Id.) Principal contends that this answer was false and intentionally misleading, and that a truthful answer would have explained that the purpose of obtaining the policies was for their eventual resale on the secondary market, consistent with what was indicated on First Priority's credit approval memorandum. Principal contends that the answer was likely deliberately misleading, because Ronald Perry knew that Principal never would have issued the policies if the insurer knew that the policies were intended for immediate resale to investors.

The second question on the POI asked whether the insured intended to "borrow money to pay the premiums for this policy or have someone else pay these premiums for you in return for an assignment of policy values back to them." (Id.) As with the first question, this question was answered "yes," although it included the following

explanation: "[Mrs. DeRose] is making gifts to Irrevocable trust for the benefit of the grandchildren.  The trust will pay the premiums."  (Id.)  Principal contends that this explanation was knowingly false, and that a truthful answer would have disclosed that the premiums would be financed through a non-recourse premium loan – something that was known at the time, since an application had been submitted to Coventry weeks earlier seeking to arrange for premium financing.

Defendants initially observe that the "yes" answers provided on the POI were, in fact, truthful.  However, the real thrust of Defendants' argument that these asserted "misrepresentations" provide no legitimate basis for declaring the policies void is that Ronald Perry was an agent of Principal, and because other Principal employees knew about the answers to the questions on the application and the POI.  In short, Defendants do not so much challenge Principal's claim that the answers provided were deliberately misleading, but instead assert that Principal should be bound by the acts or omissions of its agents and employees who either participated in or were aware of the misrepresentations at the time they were made.

We conclude that the dispute over whether misrepresentations were made, and, if so, whether Principal should be estopped from asserting them as a basis for seeking to void the policies cannot be resolved at the summary judgment stage of litigation. First of all, there are questions of fact as to whether Perry was acting on behalf of

Mrs. DeRose or Principal when he helped prepare and submit the application and the POI. Furthermore, even if it were clear that Perry was acting as Principal's agent at that time – something that is, in fact, not clear from the record – there is evidence that could allow a factfinder to conclude that Perry was acting outside the scope of his authority. Although Defendants urge the Court to find that other Principal employees either helped to facilitate the misrepresentations made on the application and POI, or were otherwise aware of and complicit in these misrepresentations, we find that this matter needs to be resolved at trial rather than on summary judgment. The individuals whom Defendants argue had knowledge of the alleged misrepresentations did not, in fact, make any of the misrepresentations on the application and POI, as these appear to have been made exclusively by Mr. Perry.

We agree with Principal that even if it is ultimately found that Ronald Perry was acting as Principal's agent – something that seems questionable, given the contractually-defined scope of his relationship with Principal – factual disputes exist as to whether Perry was acting outside the scope of the relationship in connection with applying for the DeRose policies. Principal has submitted a copy of its contract with Perry, which indicates that Mr. Perry's relationship with Principal was that of an "independent contractor," and that the contract is governed by Iowa law in accordance with the choice-of-law provision provided for in the contract. (Doc. 123,

Ex. D, at 1, 3.)  Under Iowa law, "[t]he actions of an independent broker in the procurement of a policy are not imputable to the insurance carrier that issued the policy."  See Fireman's Fund Ins. Co. v. ACC Chem. Co., 538 N.W.2d 259, 264 (Iowa 1995) (citation omitted).  Moreover, under Iowa law, there is a presumption that an insurance broker acts as the agent of the insured for which he is working, rather than of the insurer.  See Van G. Miller & Assocs. v. Gulf Ins. Co., No. 00-2051, 2001 U.S. Dist. LEXIS 11522, at *9-10 (N.D. Iowa Aug. 8, 2001) (Iowa law); see also General Cas. Ins. Co. v. Exterior Sheet Metal, Inc., No. 01-2085, 2002 U.S. Dist. LEXIS 25423, at *37 (N.D. Iowa Dec. 24, 2002) ("It is well-settled law that an insurance broker . . . is presumptively the agent of the insured . . . and not of the insurer.").  Thus, under the law governing the parties' contract, Perry is presumptively considered to be the agent of the insured – not Principal.[9]  Given the numerous unresolved factual questions about whether the answers on the POI were, in fact, misrepresentations, as well as unresolved questions about Principal's relationship with Ronald Perry and other agents or employees who may have been involved in the

---

[9]  Furthermore, we observe that the record contains facts showing that in undertaking to procure insurance on Mrs. DeRose's life, Mr. Perry claimed to have been working, in part, toward assisting with Mrs. DeRose's estate planning in his capacity as a lawyer.  (Doc. 123, Ex. C, Perry Dep. at 12-14.)  This evidence further suggests that Mr. Perry was working as either a fiduciary or agent of Mrs. DeRose, rather than as Principal's agent, in connection with these insurance transactions.

insurance and loan transactions at the heart of this action, we do not find that Defendants have satisfied their heavy burden of showing that they are entitled to judgment as a matter of law at this stage of the proceedings on Principal's misrepresentation claims.[10]

> **D.    Defendants Have Not Satisfied Their Burden of Demonstrating that They Are Entitled to Summary Judgment on Principal's Claims for Damages.**

In addition to seeking a declaratory judgment that the policies issued the Trust are void *ab initio* for lack of insurable interest, and for misrepresentations allegedly made during the application process, Principal is seeking to retain some or all of the premiums that it has received for the policies as set-off to the costs and expenses allegedly incurred as a result of issuing the policies.  For their part, Defendants described Principal's effort to retain millions of dollars in premiums that it has collected with a porcine metaphor, calling this conduct "hog like," (Doc. 105, at 23), asserting that Principal greedily seeks to keep substantial premiums that were paid on

---

[10]  Defendants have also raised a number of questions about the actions of other Principal agents during the application process, and Defendants have asserted that the conduct of these parties should be attributed to Principal and prevent the insurer from asserting that the policies are void for misrepresentations made on the POI.  As with the dispute over Mr. Perry's involvement, and its significance to the factual and legal issues in this case, we find that questions remain as to what relevance and legal significance, if any, the alleged actions of other parties affiliated with Principal have on Principal's misrepresentation claim.

policies that Principal seeks to disavow in this suit – an action brought approximately two years after the policies were issued.

As an initial matter, there appears to be some lingering confusion on Defendants' part as to whether Principal is seeking rescission of the insurance agreements.  It is clear that Principal is not seeking rescission, but is instead seeking a declaration from the Court regarding the parties' legal rights and obligations under the policies.  (Doc. 1, at ¶ 1) "(This is an action for Declaratory Judgment under 28 U.S.C. § 2201.  Principal Life seeks a declaration relative to its rights and obligations under three policies of life insurance issued on the life of JoAnn DeRose[.]") Thus, although Defendants offer case law suggesting that in actions seeking rescission of a contract, the party seeking rescission is ordinarily not entitled to retain monies paid, or to seek damages, Principal has not sought rescission.

Instead, Principal is contending that it may be entitled to retain some or all of the premiums it has been paid for the policies on the grounds that Defendants engaged in fraud and that Principal incurred substantial costs as a result of this fraud. As Principal notes, the leading insurance treatise notes that

> Where the policy is void by reason of the fraudulent misrepresentation or concealment of the insured or his or her agent, or if, by deception and false pretenses in matters material to the risk, he or she induces the insurer to assume a risk which would either have been refused, or, if taken at

32

> all, would only have been issued on different terms, the
> insured has no right to the return of premiums.

Couch on Insurance 3d, § 79:40; see also Moss v. United States, 101 F. Supp. 692,

693 (W.D. Pa. 1951) (disallowing claim by insured to recover premiums paid on a

policy declared void due to fraudulent misrepresentation). Although Principal now

offers this legal justification for retaining the premiums paid, it appears that

Principal's main justification for retaining some or all of the premiums is that the

insurer incurred costs and expenses in issuing these policies.

Upon consideration, we will recommend that the Court deny Defendants'

motions to the extent they seek summary judgment on Principal's claim to retain

premiums, or for damages. Given that the legal argument offered in support of this

position was predicated on an erroneous interpretation of Principal's claims in this

case, and because factual issues pervade this case with respect not only to whether the

policies may be declared void, but also with respect to Principal's claim for damages,

and what costs and expenses Principal has actually incurred as a result of issuing the

policies, summary judgment is inappropriate.

## V.    RECOMMENDATION

Accordingly,   for   the   reasons   set   forth   above,   IT   IS   HEREBY

RECOMMENDED THAT Defendants' motions for summary judgment (Docs. 104

and 114) be DENIED.

> The parties are further placed on notice that pursuant to Local Rule 72.3:
> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter described in
> 28   U.S.C.   §   636   (b)(1)(B)   or   making   a   recommendation   for   the
> disposition of a prisoner case or a habeas corpus petition within fourteen
> (14) days after being served with a copy thereof. Such party shall file
> with the clerk of court, and serve on the magistrate judge and all parties,
> written objections which shall specifically identify the portions of the
> proposed findings, recommendations or report to which objection is
> made and the basis for such objections. The briefing requirements set
> forth in Local Rule 72.2 shall apply. A judge shall make a de novo
> determination of those portions of the report or specified  proposed
> findings or recommendations to which objection is made and may
> accept, reject, or modify, in whole or in part, the findings or
> recommendations made by the magistrate judge. The judge, however,
> need conduct a new hearing only in his or her discretion or where
> required by law, and may consider the record developed before the
> magistrate judge, making his or her own determination on the basis of
> that record. The judge may also receive further evidence, recall
> witnesses or recommit the matter to the magistrate judge with
> instructions.

*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: July 15, 2011

34