## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PRINCIPAL LIFE INSURANCE COMPANY,** | : | **CIVIL ACTION NO. 1:08-CV-2294** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MARK DeROSE, and MATTHEW DeROSE, as Trustees of the JoAnn DeRose Family Trust, and FIRST PRIORITY BANK,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently before the court is the report (Doc. 178) of the United States

Magistrate Judge, the Honorable Martin C. Carlson, recommending that the

motions for summary judgment (Docs. 104, 114) filed by defendants First Priority

Bank ("First Priority") and Mark DeRose and Matthew DeRose, as Trustees of the

JoAnn DeRose Family Trust ("the Trustees") be denied.  The Trustees and First

Priority have filed objections to the magistrate judge's report and recommendation

("R&R").  For the reasons set forth below, the court will adopt the R&R in part and

reject it in part.

# I.   **Background**[1]

The instant litigation is a declaratory judgment action filed by Principal Life Insurance Company ("Principal") to determine its rights and obligations under three life insurance policies issued on the life of JoAnn DeRose ("Ms. DeRose").

## A.   **Principal's Prohibition of Stranger Originated Life Insurance**

On January 30, 2006, Principal enacted a policy prohibiting the sale of stranger originated life insurance ("STOLI"). In a STOLI transaction, a person purchases life insurance on his or her own life "in order to subsequently assign the

---

[1] The magistrate judge's report recites the undisputed facts of this case in greater detail. The factual background set forth in this opinion derives from the magistrate judge's recitation of the facts.

policy to a third party following the lapse of the two-year contestability period."[2]

Lincoln Nat. Life Ins. Co. v. Calhoun, 596 F. Supp. 2d 882, 885 (D.N.J. 2009).

Principal's policy explicitly prohibited any form of STOLI, "including non-recourse premium financing . . . as these are almost always tied directly or indirectly to a sale to an investor group." (Doc. 196, Ex. A). Principal also amended its application process to require all applicants and their brokers to fill out a Policy Owner Intent form ("POI"). (Id.) The form asked the following three questions:

> 1.   Is there an intention that any group of investors will obtain any right, title, or interest in any policy issued on the life of the Proposed Insured(s) as a result of the policy applied for? . . . If yes, explain.
>
> 2.   Will you borrow money to pay the premiums for this policy or have someone else pay these premiums for you in return for an assignment of the policy values back to them? . . . If yes,

---

[2]  The typical STOLI transaction involves the following:

> An agent attempts to sell a life insurance policy to an elderly insurable candidate, and offers the candidate up-front cash in exchange for promising a future sale of the policy. The agent informs the candidate that the candidate will be able to obtain the policy at virtually no cost to himself, because the agent has secured non-recourse financing to purchase the policy. The candidate then acts as a "nominal grantor" of a life insurance trust that is used to apply for the policy. "At that time, the agent will tell the insured that, in all probability, the policy will be sold to investors for a price that will pay the loan and accrued interest, leaving a profit to split between the agent and the insured . . . . If the insured survives [the two-year contestability period on the policy], the owner (the life insurance trustee) typically has two options, in addition to the sale of the policies to investors: (1) have the insured pay the outstanding debt with accrued interest and retain the policy; or (2) transfer the policy to the lender in lieu of foreclosure."

Lincoln Nat. Life Ins. Co. v. Calhoun, 596 F. Supp. 2d 882, 885 (D.N.J. 2009) (quoting Alan Jensen & Stephan R. Leimberg, Stranger-Owned Life Insurance: A Point/Counterpoint Discussion, 33 ACTEC J. 110, 111 (2007)).

> explain and complete premium financing acknowledgment
> form (DD2588).
>
> 3.     Have you transferred or assigned any right, title, or interest in
> any life insurance or annuity contract other than absolute
> assignment for Internal Revenue Code 1035 exchange? . . . If
> yes, explain.

(Id.)  The premium acknowledgment form stated that Principal would not accept

applications submitted as part of a non-recourse loan arrangement.[3]  (Id.)

## B.    The DeRose Life Insurance Policies

On December 5, 2006, Ms. DeRose submitted an application for a life

insurance policy for $ 25 million of coverage.[4]  (Doc. 196, Ex. B).  The application

listed the JoAnn DeRose Family Trust ("Trust") as the intended owner and

beneficiary of the policy.[5]  (Id.)  The application listed Ronald Perry ("Perry"), an

independent broker authorized to sell Principal life insurance policies, as the

broker representative.  (Id.)  Perry was affiliated with Delaware Valley Financial

Group ("Delaware Valley"), a business center which marketed and sold insurance

and financial products on behalf of Principal.[6]  All brokers at Delaware Valley were

---

[3] Although Principal prohibited non-recourse premium financing arrangements,
it did not prohibit all assignments of life insurance policies as collateral for loans.
(See Doc. 182, Ex. M, at 48).

[4] On December 22, 2006, Ms. DeRose requested to increase the insurance
coverage to $35 million and to split the coverage among three separate life
insurance policies.  (Doc. 196, Ex. J).

[5] The Trust named Matthew DeRose and Mark DeRose as the trustees and Ms.
DeRose's children and grandchildren as the beneficiaries.  (Doc. 196, Ex. Q).

[6] Although Delaware Valley was comprised of Principal's employees and
independent brokers, it was independently owned.  (Doc. 182, Ex. D).

subject to broker agreements with Principal, which provided, *inter alia*, that they must "conform to and comply with all of [Principal's] policies and procedures." (See, e.g., Doc. 196, Ex. D).  The broker agreements also provided that brokers could not "[a]ccept risks of any kind, determine insurability, or bind [Principal] in any way" nor "[w]aive any provision of any policy."  (Id.)

Ms. DeRose and Perry submitted a POI as part of the application process. (Doc. 196, Ex. B).  Ms. DeRose and Perry answered yes to the first two questions. The explanation to the first question stated, "[s]he has policies on her life owned by her children and also policies owned by Irrevocable Trusts.  This policy is in place for the benefit of her grandchildren."  (Id.)  The explanation to the second question stated, "[s]he is making gifts to Irrevocable Trusts for the benefit of the grandchildren.  The trust will pay the premiums."  (Id.)  Along with the application, Ms. DeRose and Perry submitted a check for the first quarter premiums on the policies drawn on an escrow account belonging to Perry.  (Doc. 196, Ex. G).

The application was reviewed by Joanie Cherrier ("Cherrier"), an underwriter for Principal.  (Doc. 196, Ex. I, at 6-7).  Cherrier testified at her deposition that she believed that Perry and Ms. DeRose did not understand the questions on the POI and that Ms. DeRose was merely explaining the purpose of the life insurance policies.  (Id. at 71-77, 91-92, 99).  Cherrier also testified that she did not believe the policies were intended to be re-sold on the secondary market or that premium financing would be used to pay for the policies.  (Id. at 71-77, 98-99).

Principal approved Ms. DeRose's application.  (Id. at 117, 130, 137, 147-48, 159).  On December 27, 2009, Principal issued three insurance policies (the "policies") on Ms. DeRose's life; two policies provided $ 12.5 million in coverage (Policy No. 6076175 and 6076176), and one provided $ 10 million in coverage (Policy No. 6075463).  The policies would become effective once all delivery requirements, including a signed delivery receipt and payment for the balance of the premium due, were returned to Principal's home office.  (Doc. 196, Ex. M).

On January 22, 2007, Michele Madden ("Madden"), a team leader for Delaware Valley, contacted Erik McMaster at Principal's home office to tell him that she had mistakenly sent back the delivery requirements on January 19th. (Doc. 196, Ex. N).  Madden requested that Principal mark the delivery requirements as still pending.  (Id.)  Principal accommodated Madden's request.  (Id.)  On February 15, 2007, the delivery requirements were resent to Principal and the polices became effective.  (Doc. 196, Ex. O).

## C.   <u>**Financing Arrangements**</u>

Delaware Valley employees, including Marc Smith ("Smith") and Tom Schirmer ("Schirmer"), assisted Ms. DeRose and the Trustees in obtaining financing for the policies.[7]  (See Doc. 182, Ex. J, at 63-71; Doc. 182, Ex. L, at 49, 91, 110-18, 123-24).  Both Schirmer and Smith knew that the Trust intended to obtain

---

[7]  Smith and Schirmer served as both co-managing directors and independent brokers for Principal. Their responsibilities as co-managing directors involved internal administrative functions and strategic planning; their responsibilities as independent brokers involved the sale of insurance. (See Doc. 182, Ex. F ¶ 26; Doc. 201, Ex. D).

premium financing.[8]  (Doc. 182, Ex. J, at 72-80; Doc. 196, Ex. P).  Approximately one

month before Ms. DeRose applied for life insurance from Principal, Ms. DeRose

submitted an application for non-recourse premium financing to Coventry Capital

("Coventry").  (Doc. 196, Ex. P).  Smith signed the application as an agent.  (Id.)

Coventry approved the application, however, the Trust ultimately chose to obtain

financing from First Priority.  (Doc. 196, Ex. R; Doc. 196, Ex. U).  The loan

transaction with First Priority closed on February 22, 2007, seven days after the

delivery requirements were returned to Principal.  (Doc. 196, Ex. U).

Under terms of the Loan and Security Agreement, First Priority agreed to

loan the trust $1,515,000 to cover twenty-seven months of premiums, twenty-seven

months of interest payable to First Priority, and a loan commitment fee payable to

First Priority.  (Id.)  Only the policies secured the loan.  (Id.)  Prior to entering into

this loan agreement, First Priority did not speak to Ms. DeRose or her sons, did not

require Ms. DeRose to post any collateral to secure the loan or personally guarantee

repayment, and did not conduct any underwriting to determine whether the Trust

could repay the loan.  (Doc. 196, Ex. T, at 30, 36, 61-62, 173; Doc. 196, Ex. U, at 7;

Doc. 196, Ex. Y, at 17-18; Doc. 196, Ex. Z, at 29).  First Priority's Credit Approval

Memorandum ("memorandum") for the DeRose loan stated that the principal

source of repayment "is the sale of the three assigned life insurance policies in the

secondary market, via a life settlement transaction."  (Doc. 196, Ex. W, at 8).  The

---

[8]  Perry also knew that the Trust planned to obtain premium financing.  (Doc. 182, Ex. G, at 128-29).  Both Perry and Schirmer knew of Ms. DeRose's answers on the POI form.

memorandum also stated that the Corporate Planning Group ("CPG") would market and sell the policies in the secondary market.  (Id. at 6).  CPG guaranteed that it would repay the loan to First Priority if the policies could not be resold.[9]  (Doc. 196, Ex. AA).

On February 23, 2007, the Trustees executed forms of Assignment of Life Insurance on each of the policies.  (Doc. 201, Ex. A).  Principal acknowledged these assignments on March 30, 2007.  (Id.)

### D.   **Procedural History**

On December 23, 2008, Principal filed the instant declaratory judgment action against Mark Derose and Matthew DeRose as Trustees of the JoAnn DeRose Family Trust.  (Doc. 1).  Principal alleges that the Trustees purchased the policies as part of a STOLI scheme and that the Trustees concealed their intended use of non-recourse financing on the application for the policies.  Principal seeks a declaration that the policies are void or voidable on grounds that: (1) the policies lacked an insurable interest at inception, and/or (2) the POI contained material misrepresentations.  (Id.)  Principal also seeks a declaration that it may retain some or all of the premiums paid as an off-set to the costs and expenses it has incurred.  (Id.)

---

[9] Delaware Valley, Perry, and CPG entered into a separate arrangement splitting the commission on any sale of the policies.  (Doc. 196, Ex. DD).

On May 17, 2010, First Priority filed a motion to intervene in the lawsuit.[10] (Doc. 72).  The magistrate judge granted the motion on June 29, 2010.  (Doc. 90). After the close of discovery, First Priority and the Trustees filed separate motions for summary judgment.  (Docs. 104, 114).  On July 15, 2011, Magistrate Judge Carlson issued his report (Doc. 178) recommending that the court deny the Trustees' and First Priority's motions for summary judgment.  (Doc. 178).  Both First Priority and the Trustees filed timely objections to the report.  (Docs. 181, 183). The parties have fully briefed the issues, and the matter is now ripe for disposition.

## II.  **Standard of Review**

### A.  **Standard of Review for Motions for Summary Judgment**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(a).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); see also FED. R.

---

[10] On February 25, 2010, First Priority declared the Trustees to be in default. (Doc. 184, Ex. C).  First Priority indicated that it would continue to make all premium payments necessary to keep the policies in effect.  (Id.)

CIV. P. 56.  Only if this threshold is met may the cause of action proceed.  Pappas,

331 F. Supp. 2d at 315.

### B.  Standard of Review for a Magistrate Judge's Recommendation

Where objections to a magistrate judge's report and recommendation are

filed, the court must perform a de novo review of the contested portions of the

report.  Supinski v. United Parcel Serv., Civ. A. No. 06-0793, 2009 WL 113796, at *3

(M.D. Pa. Jan. 16, 2009) (citing Sample v. Diecks, 885 F.2d 1099, 1106 n. 3 (3d Cir.

1989); 28 U.S.C. § 636(b)(1)(c).  "In this regard, Local Rule of Court 72.3 requires

'written objections which . . . specifically identify the portions of the proposed

findings, recommendations or report to which objection is made and the basis for

those objections.'"  Id. (citing Shields v. Astrue, Civ. A. No. 07-417, 2008 WL

4186951, at *6 (M.D. Pa. Sept. 8, 2008)).

## III.  Discussion

### A.  Insurable Interest Requirement

The magistrate judge concluded that First Priority and the Trustees are not

entitled to summary judgment because questions of fact exist as to whether an

insurable interest existed under Pennsylvania law at the time the insurance policies

were issued.  (Doc. 178, at 17-26).  The magistrate judge based this conclusion on his

interpretation of Title 40, Section 512 of the Pennsylvania Consolidated Statutes

(" § 512" or "Section 512").  Section 512 provides:

> Any person may insure his own life for the benefit of any person,
> copartnership, association, corporation, or trustee of a trust established by a
> person, copartnership, association or corporation, but no person shall cause
> to be insured the life of another, unless the beneficiary named in such policy

or agreement of life insurance, whether himself or a third person, has an insurable interest in the life of the insured.  If a policy of life insurance has been issued in conformity with this section, no transfer of such policy or any interest thereunder shall be invalid by reason of a lack of insurable interest of the transferee in the life of the insured or the payment of premiums thereafter by the transferee.  The term "insurable interest" is defined as meaning, in the case of persons related by blood or law, an interest engendered by love and affection, and, in the case of other persons, a lawful economic interest in having the life of the insured continue, as distinguished from an interest which would arise only by the death of the insured.

40 Pa. Cons. Stat. § 512.  The magistrate judge, relying primarily on extra-jurisdictional cases, stated that under § 512 whether an insurable interest exists at inception is governed by the parties' intentions.  (Doc. 178, at 21-23).  Based on this interpretation of § 512, the magistrate judge determined that questions of fact existed regarding the intent of the Trustees at the inception of the insurance policy and recommended denying the motions for summary judgment on the issue of whether an insurable interest existed at inception.  (Id. at 24-26).  First Priority and the Trustees object to the magistrate judge's recommendation, primarily asserting that the parties' intent is irrelevant under § 512.  (Doc. 182, at 12-18; Doc. 184, at 8-15).

The Supreme Court of Pennsylvania has yet to decide whether the parties' intent is relevant to the insurable interest requirement of § 512.  As a federal court sitting in diversity jurisdiction, the court must apply Pennsylvania substantive law and predict how the Pennsylvania Supreme Court would rule on this issue.  Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 45 (3d Cir. 2009).  In making this prediction, the court must consider "relevant state precedents, analogous decisions, considered

dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." <u>Nationwide Mut. Ins. Co. v. Buffetta</u>, 230 F.3d 634, 637 (3d Cir. 2000) (quoting <u>McKenna v. Ortho Pharm. Corp.</u>, 622 F.2d 657, 663 (3d Cir. 1980)).

The Pennsylvania Supreme Court applies the Pennsylvania Statutory Construction Act ("Statutory Construction Act") to interpret statutes. 1 PA. CONS. STAT. § 1921; <u>see also</u> <u>Bayada Nurses, Inc. v. Com., Dep't. Of Labor and Indus.</u>, 8 A.3d 866, 880-81 (Pa. 2010). The Statutory Construction Act states that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 PA. CONS. STAT. § 1921(a). If the plain language of the statute is unambiguous, "the letter of it is not to be disregarded under the pretext of pursuing its spirit." <u>Id.</u> § 1921(b); <u>see also</u> <u>Bayada</u>, 8 A.3d at 880-81 (Pa. 2010) (observing that the best indication of legislative intent is the plain language of the statute). Statutory construction factors, such as the "former law, if any" or "[t]he circumstances under which it was enacted," are only relevant when the statute is ambiguous. 1 PA. CONS. STAT. § 1921(c).

In the instant case, the relevant statute is unambiguous. Section 512 defines the insurable interest requirement solely in terms of the relationship between the insured and policy beneficiary. <u>See</u> 40 PA. CONS. STAT. § 512. Furthermore, the statute explicitly states that "no transfer of such policy or any interest thereunder shall be invalid by reason of a lack of insurable interest of the transferee in the life of the insured or the payment of premiums thereafter by the transferee" if an

12

insurable interest existed at inception.  Id.  The statute does not contain any language referencing the "intent of the parties" at inception or that subsequent transfers of policies must be in "good-faith."[11]  See 40 Pa. Cons. Stat. § 512. Notably, Principal does not argue that § 512 is ambiguous.  Instead, Principal asks the court to view the statute in the "proper legal context."  (Doc. 196, at 21).  This court cannot, however, ignore the plain language of the statute "under the pretext of pursuing its spirit."  1 Pa. Cons. Stat. § 1921(b).

At common-law, life insurance policies had to be supported by an insurable interest at inception.  See Grigsby v. Russell, 222 U.S. 149, 156 (1911).  Pennsylvania codified this common-law requirement in 1921.  Insurance Company Law of 1921, P.L. 682.  The original 1921 statute did not address whether a policy could be transferred to an individual lacking an insurable interest.  In 1940, the Supreme Court of Pennsylvania addressed the issue in Werenzinski v. Prudential Insurance Company of America, 14 A.2d 279 (Pa. 1940). In Werenzinski, the court concluded that the Insurance Company Law of 1921 prohibited assignments to any person or entity that lacked an insurable interest in the insured and henceforth paid the premiums.  Id. at 280-81.  The Pennsylvania General Assembly subsequently amended the statute in 1951 ("1951 amendment") to provide that "[i]f a policy of life insurance has been issued in conformity with this section, no transfer of such policy

---

[11]  Principal uses the term "good-faith transfers" to describe assignments that arise from subsequent happenings versus transfers contemplated at the inception of the policy.  The court adopts the term "good-faith transfers" for readability purposes only.  The court by no means suggests that assignments contemplated at the inception of the policy uniformly constitute "bad-faith transfers."

or any interest thereunder shall be invalid by reason of a lack of insurable interest of the transferee in the life of the insured or the payment of premiums thereafter by the transferee." 40 Pa. Cons. Stat. § 512.  Principal asserts that the 1951 amendment permits only "good-faith transfers."  The amendment, however, does not specify any such good-faith limitation.  This court cannot "under its powers of construction, supply omissions in a statute" even if "the omission resulted from inadvertence."[12]  Commonwealth v. Shafer, 202 A.2d 308, 312 (Pa. 1964) (observing that courts must give effect to the plain meaning of a statute "notwithstanding the fact that the court may be convinced by extraneous circumstances that the legislature intended to enact something very different from that which it did enact." (internal citations and quotations omitted)).

---

[12] Principal argues that "it is a fundamental rule of statutory construction that, wherever possible, a court must read a statute in conformity with the existing common law." (Doc. 196, at 20).  The cases relied on by Principal, however, involved statutory language that was either ambiguous or silent on the relevant issue.  See Vine v. Com., State Employees' Retirement Bd., 9 A.3d 1150, 1163 & n.18 (Pa. 2010) (refusing to imply language into the statute and noting "we merely enforce the enactment according to express contours, leaving intact common law principles not addressed by the General Assembly"); Central Lithograph Co. v. Eatmor Chocolate Co., 175 A. 697, 701 (Pa. 1934) (interpreting the meaning of "realty,""freehold," and "material injury to the freehold").  Principal has not identified any ambiguous language in § 512.  In the instant case, the statute unambiguously addresses the relevant issue, i.e. that a life insurance policies may be assigned if an insurable interest existed at inception.

Principal also cites In re Lilly for the proposition that when the legislature uses language previously construed by the Pennsylvania Supreme Court in a subsequent statute, there is a presumption that the legislature intended the statute to be interpreted in the same way.  See 19 A.2d 92, 94 (Pa. 1941); see also 1 Pa. Cons. Stat. § 1922.  Again, this presumption is only applicable if the statute is ambiguous.  Moreover, Principal failed to cite any cases interpreting the relevant portions of § 512.  See infra footnote 13 (discussing Werenzinski).

Assuming *arguendo* that the Pennsylvania Supreme Court engaged in an examination of the "proper legal context," that inquiry demonstrates, at most, ambiguity regarding the intent of the Pennsylvania legislature in passing the 1951 amendment.  Principal relies on language from Werenzinski to argue that intent of the policy holder is germane to the question of whether an insurance interest exists at inception.  See 14. A.2d at 280 (noting that if assignment of a policy "is merely a subterfuge, planned or contemplated when the policy was issued, to enable the assignee thereby to accomplish what he could not have done directly, namely, to obtain insurance on a life wherein he had no insurable interest, it would not be sustainable").  The alleged intent requirement referenced in Wereninski, however, does not implicate the insurable interest requirement of § 512 at all.  Rather, the Werenzinski court referenced intent solely in its discussion of the *common-law exception* to the insurable interest requirement that prohibited all assignments of insurance policies.[13]  Id.

The  Werenzinski ruling in 1940 does not illuminate the intent of the Pennsylvania General Assembly in 1951.  Principal has not provided any legislative history demonstrating that the General Assembly intended to permit only "good-

---

[13]  In its discussion of the assignability of insurance policies to persons having no insurable interest, the Werenzinski  court never referenced the Pennsylvania statute.  Id. at 280-81.  Rather, the Werenzinski court exclusively cited cases that were decided *before* the passage of the Insurance Company Law of 1921 or that involved transactions that occurred prior to the effective date of the Insurance Company Law of 1921.  Thus, Werenzinski sheds no light on the insurable interest requirement of § 512.

faith transfers."[14]  Presumably, if the General Assembly intended to permit only good-faith transfers, they would have included the words "good-faith," or some variation to implicate the intent of the transferor, in the statute.  The position advanced by First Bank and the Trustees—that the 1951 amendment rejected prior case-law including <u>Werenzinski</u> and was passed to permit all transfers of a life insurance policy to strangers to the insured life—is equally if not more plausible than the position advanced by Principal.  (Doc. 184, at 12-13; Doc. 201, at 11 n.4).  I conclude that the Pennsylvania Supreme Court would not depart from the plain and unambiguous language of § 512 based solely on Principal's conjecture.

Moreover, the Pennsylvania Supreme Court's analysis of the statute's proper legal context would also include an examination of analogous case-law from other jurisdictions.  Section 512 is quite different from insurance statutes in many other states because it expressly authorizes transfers of policies that are properly issued.[15]

---

[14]  The court has conducted an exhaustive search for legislative history on the 1951 amendment.  The court has been unable to find any legislative history except the legislative history submitted by First Priority.  (<u>See</u> Doc. 201, Ex. C).

[15]  The cases relied on by the magistrate judge are plainly distinguishable from the instant case.  <u>See</u> <u>Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust</u>, 735 F. Supp. 2d 130 (D. Del. 2010) (interpreting a Delaware statute—18. DEL. CODE ANN. § 2704—that does not expressly authorize transfers to an individual without an insurable interest); <u>PHL Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Trust</u>, No. 08-572, 2010 WL 2539755 (D. Minn. Mar. 3, 2010) (discussing intent only in the context of a fraudulent misrepresentation claim); <u>Sun Life Assurance Co. v. Moran</u>, Nos. 08-0629, 08-0632, 2009 WL 2450443 (D. Ariz. Aug. 11, 2009) (interpreting an Arizona statute—ARIZ. REV. STAT. ANN. § 20-1104—that does not expressly authorize transfers to an individual without an insurable interest); <u>Life Prod. Clearing, LLC v. Angel</u>, 530 F. Supp. 2d 646 (S.D. N.Y. 2008) (later overturned by the New York Court of Appeals in <u>Kramer v. Phoenix Life Insurance Company</u>, 940 N.E.2d 535 (N.Y. 2010)).

40 PA. CONS. STAT. § 512.  New York's insurance statute contains the most comparable language permitting transfer or assignments of life insurance policies. See N.Y. INSURANCE LAW § 3205 ("Nothing herein shall be deemed to prohibit the immediate transfer or assignment of a contract so procured or effectuated.").  In Kramer v. Phoenix Life Insurance Company, the New York Court of Appeals held that the New York statute permitted "a person to procure an insurance policy on his or her own life and immediately transfer it to one without an insurable interest in that life, even where the policy was obtained for just such a purpose."[16]  940 N.E.2d 535, 536-37 (N.Y. 2010).  The court noted that the plain language of the statute did not contain an intent requirement nor did the statute attempt to prescribe the insured's motivations; instead it "explicitly allows for immediate transfer or assignment."  Id. at 541 (internal quotations omitted).  The court held, that to the extent the statute was in conflict with the common-law requirement that an insured cannot obtain a life insurance policy with the intent of immediately assigning the policy to a third party, the common-law had been modified by the "unambiguous statutory language."  Id. at 542.  The court concluded by explaining that it was not the role of the judiciary "to engraft an intent or good faith requirement" onto a statute that explicitly allows an insurer to freely transfer his or

_____

[16]  In 2009, the New York Legislature added several new provisions prohibiting stranger-originated life insurance to the New York insurance statute.  N.Y. INSURANCE LAW § 7815(a).  These provisions were not considered by the Kramer court because they did not go into effect until May 18, 2010.  Kramer, 940 N.E.2d at 539 n.5.

her policy.[17]  Id.  As the most analogous decision to the instant case, the

Pennsylvania Supreme Court would find Kramer to be persuasive.[18]

The magistrate judge's conclusion that genuine issues of material fact

precluded entry of summary judgment in favor of First Priority and the Trustees

was based on the incorrect finding that intent is relevant under § 512.  As explained

above, under § 512 the insurable interest requirement is determined solely by the

relationship between the insured and the policy beneficiaries.  The undisputed

beneficiary of the insurance policies at their inception was the Trust and the

undisputed beneficiaries of the Trust were Ms. DeRose's children.  (Doc. 1 ¶¶ 23-24;

Doc. 105, Ex. C).  A parent-child relationship constitutes an insurable interest under

---

[17]  This court is acutely aware of the law's general distaste for wager policies and recognizes the importance of the insurable interest doctrine.  The court notes that this decision does not vitiate the statutory requirement that an insurable interest exist at the time of inception or that the insured must apply for the policy.  40 PA. CONS. STAT. § 512.  There may or may not be a fundamental difference between persons with an insurable interest using life insurance policies as a financial planning mechanism by immediately assigning the policies to third parties and direct wagering by third parties with no insurable interest.  It is the job of the Pennsylvania General Assembly, however, and not this court to weigh the competing policy considerations.  Neither this court nor the Pennsylvania Supreme Court can engraft an intent or good-faith requirement onto § 512 based on its own policy preferences.

[18]  Kramer is distinct in one respect.  In Kramer, the insured took out an insurance policy on his own life.  Id. at 537.  In the instant case, the Trust took out the policy on Ms. DeRose's life.  This distinction is immaterial because the statutory language of § 512—allowing the transfer of a life insurance policy that is valid at inception—is equally applicable to a policy taken out on the life of another if the beneficiary of that policy has an insurable interest in the life of the insured.  40 PA. CONS. STAT. § 512.

the Pennsylvania law.  <u>Clayton v. Indus. Life Ins. Co.</u>, 56 A.2d 292, 293 (Pa. 1948).

Therefore, as a matter of law, the Trust had an insurable interest in the life of Ms.

DeRose and First Priority and the Trustees are entitled to summary judgment on

the issue.

### B.    **Material Misrepresentations**

The magistrate judge recommended denying First Priority's and the

Trustee's motion for summary judgment on the issue of material

misrepresentations because genuine issues of material fact exist as to whether

misrepresentations were made on the POI, and if so, whether Principal is estopped

from asserting the misrepresentations as a basis for voiding the insurance policies.

(Doc. 178, at 26-31).  The magistrate judge's report focuses primarily on the actions

and knowledge of Perry—the Trustees' attorney who filled out the POI.  The

magistrate judge found that it was unclear whether Perry was acting on behalf of

Ms. DeRose or Principal, and if Perry was acting on behalf of Principal, whether

Perry was acting within the scope of the agency relationship.  (<u>See</u> <u>id.</u>)  First

Priority objects to the magistrate judge's recommendation to deny summary

judgment on the issue of material misrepresentations.  First Priority argues that: (1)

Principal is estopped from denying coverage because of its acceptance of premiums

on the policies with full knowledge of the underlying facts; and (2) that no

misrepresentations occurred as a matter of law because Principal's agents were

well aware of the defendants' plans and expressly approved the POI before its remittal to Principal's home office.[19]

 First Priority contends that it is unnecessary to wade through Perry's role in the transaction because Schirmer and other Delaware Valley employees were agents of Principal and had full knowledge of the underlying facts.[20] (Doc. 182, at 23).  First Priority's estoppel and waiver theories are based on a single premise—the knowledge of Schirmer and other employees at Delaware Valley can be imputed to Principal as a matter of law.  The court holds that First Priority has not demonstrated its entitlement summary judgment on the issue of whether the policies are void or voidable due to material misrepresentations in the application.

As an initial matter, it is necessary to determine the applicable state law.[21] Pennsylvania has adopted the Restatement (Second) of Conflict of Laws ("Restatement") to resolve choice of law questions.  Gillan v. Gillan, 345 A.2d 742, 744 (Pa. Super Ct. 1975).  Principal's relationship with Schirmer and other individuals who work at Delaware Valley is governed by written agreements.  These written agreements contain a choice of law provision mandating that the contract

---

[19]  The court rejects as contradicted by the record any argument that the POI contained only factually accurate answers.  For example, the POI did not disclose that the Trust was seeking premium financing from Coventry.  (Compare Doc. 123, Ex. E with Doc. 196, Ex. P).

[20]  The court adopts the magistrate judge's finding that genuine issues of fact exist as to whether Perry was acting as Principal's agent and, if so, whether he was acting outside the scope of his agency.  (See Doc. 178, at 29-31).

[21]  Although the parties did not brief the issue, Principal applied Iowa law and First Priority applied Pennsylvania law.

be construed under Iowa law.  (See, e.g., Doc. 196, Ex. D).  Accordingly, Iowa law is applicable to determining whether an agency relationship existed and the scope of that agency relationship.  Pennsylvania law, however, is applicable for determining whether Principal is bound by the actions of Schirmer and other individuals who worked at Delaware Valley.  The Restatement provides, "[w]hether a principal is bound by action taken on his behalf by an agent in dealing with a third person is determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction under the principles stated in § 6."  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 292.  In the instant case, Pennsylvania clearly has the most significant relationship to the parties and the transaction because all relevant interactions between the Trustees, First Priority, and Principal's Delaware Valley employees and brokers occurred in Pennsylvania.

Under Pennsylvania law, "[a]n insurer is estopped from questioning the sufficiency of an [insured's] interest in insured property when the insurer has issued a policy with full knowledge of that interest" and has accepted premiums on that policy for a number of years.  In re Matthews, 229 B.R. 324, 327 (Bankr. E.D. Pa. 1999) (citing Burger King Corp. v. Cont'l Ins. Co., 359 F. Supp. 184, 189 (W.D. Pa. 1973) and Kelly v. Prudential Ins. Co. of America, 6. A.2d 55, 59 (Pa. 1939)).  Only the knowledge of an agent acting within the scope of his or her authority can be imputed to the principal.  See Houseman v. Girard Mut. Bldg. & Loan Ass'n, 81 Pa.

256 (Pa. 1876);[22] <u>St. Louis Fire & Marine Ins. Co. v. Witney</u>, 96 F. Supp. 555, 561 (M.D. Pa. 1951).

 An understanding of the proper context is crucial to determining the imputation issue.  Principal did not prohibit using its insurance policies as collateral for loans.  (<u>See</u> Doc. 182, Ex. M, at 48).  Rather, Principal prohibited the sale of STOLI and certain types of loan arrangements associated with STOLI schemes, including non-recourse premium financing in which the insured intends to sell the policy to an unrelated third party.  (<u>See</u> Doc. 196, Ex. A).  First Priority emphasizes that it merely provided a loan to finance the premiums and used the insurance policy as collateral in the event of default.  (Doc. 182, at 10).  In the light most favorable to Principal, however, ample evidences exists that the Trustees never intended to repay the loan to First Priority.  For example, First Priority's Credit Approval Memorandum for the Trustees' loan stated that the primary source of repayment of the principal would be the sale of the assigned life insurance policies to a third party investor.  (Doc. 196, Ex. W, at 4).  Further, the memorandum indicated that it was relying on CPG to sell the assigned life insurance policies in the secondary market and that CPG agreed to buy the policies in the event they could not be sold.  (<u>Id.</u> at 6).  First Priority Bank has not provided a scintilla of evidence that any Principal agent outside of the Delaware Valley office

---

[22] <u>Houseman</u> remains binding precedent.  <u>Gresik v. PA Ptnrs., L.P.</u>, 989 A.2d 344, 355 (Pa. Super. Ct. 2009).

knew any of these pivotal details about the loan arrangement between First Priority and the Trustees[23]

On the other hand, First Priority has presented substantial evidence that Schirmer and other employees at Delaware Valley not only had knowledge of the loan, but actively assisted the Trustees in obtaining the financing from First Priority. (Doc. 182, Ex. J, at 63-82). Disputed issues of material fact exist, however, regarding whether Schirmer was acting as Principal's agent during his interactions with the Trustees and First Priority, and if so, whether he was acting within the scope of his agency.[24]  Peak v. Adams, 799 N.W. 535, 546 (Iowa 2011) (noting that agency is generally a fact question). Ample evidence exists that an agency relationship existed between Schirmer and Principal. The record demonstrates that Principal employed Schirmer as a managing director. (See Doc. 182, Ex. C, at 77; Doc. 182, Ex. F, ¶ 23). This fact alone, however, does not conclusively prove that Schirmer was acting as Principal's agent with regard to the specific transactions at issue in this case. Some evidence indicates that Schirmer acted at the direction of First Priority Bank and the Trust and not Principal. (See Doc. 196, Ex. S, at 106-113 (indicating that Delaware Valley paid compensation to CPG at the direction of First

---

[23] First Priority has presented evidence that Principal knew that the Trustees' had obtained a loan for estate planning purposes and had assigned the policies as collateral for the loan. (See Doc. 182, Ex. J, at 72-80; Doc. 201, Ex. A). This does not conclusively demonstrate, however, that any employee at Principal's home office knew of facts suggesting that the loan arrangement was a prohibited STOLI scheme.

[24] The court's analysis regarding Schirmer is equally applicable to other Delaware Valley employees including Smith.

Priority)).  More importantly, some facts suggest that Schirmer was acting to

further his own personal financial interest and not the interests of Principal.  (See

Doc. 196, Ex. DD (indicating that Delaware Valley would receive compensation

from the potential settlement/sale of Ms. DeRose's insurance policies by CPG)).

This evidence creates a genuine issue of material fact regarding whether Schirmer

was acting as Principal's agent with regard to the transactions at issue.[25]

Assuming *arguendo* that Schirmer was acting as Principal's agent at the time

of the sale of the DeRose policies, genuine issues of material fact also exist

regarding whether Schirmer was acting within the scope of his agency.  To the

extent Schirmer was acting as Principal's agent in connection with the transactions

at issue in this case, it was in his capacity as independent broker for Principal.[26]

Schirmer's broker agreement specifically required him to "conform to and comply

---

[25] First Priority asserts that Principal should be estopped from arguing that
Principal's employees were acting on behalf of anyone other than Principal based
upon admissions in related litigation.  (Doc. 201, at 16).  The court declines to apply
judicial estoppel.  First Priority misconstrues the alleged "admissions" and has not
shown that Principal successfully maintained an inconsistent position in prior
proceedings.  Black v. Labor Ready, Inc., 995 A.2d 875, 878 (Pa. Super. Ct. 2010)
(noting that judicial estoppel is only properly applied if the inconsistent position
was "successfully maintained"); see also Reed Elsevier, Inc. v. Muchnick, 130 S. Ct.
1237, 1249 (2010) (internal citation omitted).

First Priority also misconstrues Principal's alleged "judicial admission"
about Perry.  Paragraph seventeen of the complaint does not state that Perry was
acting on Principal's behalf at all relevant times; instead it states "[a]t all relevant
times Mr. Perry was associated with a career business center, known as Delaware
Valley Financial Group (DVFG), operated by Principal Life to market and sell
insurance and financial products in Pennsylvania, New Jersey and Delaware."
(Doc. 1 ¶ 17).

[26] Schirmer's responsibilities as managing director were unrelated to helping
potential customers obtain life insurance.  (See Doc. 182, Ex. F ¶ 26).

with all of [Principal's] policies and procedures" and he was prohibited from incurring any liability, determining insurability, or binding Principal in any way. (Doc. 196, Ex. D).  At the time Schirmer arranged financing for the DeRose life insurance policies, Principal had established a policy explicitly proscribing non-recourse financing arrangements in which the insured intends to sell the policy to an unrelated third party as part of a STOLI scheme.  (See Doc. 196, Ex. A).

As explained above, a genuine issue of material fact exists as to whether the financing arrangement with First Priority constitutes a non-recourse financing arrangement in which the insured intended to sell the policy to an unrelated third party.  If the financing arrangement violated Principal's corporate policy, then Schirmer was acting outside the scope of his authority, and his knowledge cannot be imputed to his employer under agency law.  See Houseman, 81 Pa. at 256 (remarking that only knowledge "acquired in the course of the business in which the agent was employed" can be imputed).  Moreover, knowledge cannot be imputed if Schirmer was acting in his own self-interest to the detriment of Principal.  Official Comm. of Unsecured Creditors of Allegheny Health Educ. and Research Found. v. PriceWaterhouseCoopers, LLP, 989 A.2d 313, 333, 338 (Pa. 2010) (stating the imputation generally will not apply if the agent acts in his own interest and to the corporation's detriment).

First Priority contends that, even if Schirmer was acting outside the scope of his authority, his actions should bind Principal under the doctrine of apparent authority.  Apparent authority exists when the principal, through words or conduct,

cloaks an agent with the appearance of authority thereby causing a third person to reasonably believe that the agent has authority to act.  <u>Turner Hydraulics, Inc. v. Susquehanna Const. Corp.</u>, 606 A.2d 532, 534 (Pa. Super Ct. 1992).  Apparent authority will not exist if the third party has knowledge of the limits of the agent's authority and the third party must exercise "reasonable diligence to ascertain the agent's authority."  <u>Bolus v. United Penn Bank</u>, 525 A.2d 1215, 1222 (Pa. Super Ct. 1987) (stating that apparent authority only exists where a "person of ordinary prudence, diligence and discretion" would believe authority existed).  In the instant case, Ms. DeRose and the Trustees either knew or should have known that Principal prohibited non-recourse financing loans.  Principal required Ms. DeRose to fill out a premium financing acknowledgment form ("Form DD2558").  (Doc. 196, Ex. A).  Form DD2558 explicitly states that Principal Life "will not accept applications submitted as part of a non-recourse loan arrangement." (<u>Id.</u>)  If Ms. DeRose and the Trustees read the form then they had knowledge that Principal Life prohibited non-recourse loan arrangements and cannot rely on apparent authority; if Ms. DeRose and the Trustees did not read the premium acknowledgment form, a reasonable jury could find that they failed to act with reasonable diligence to ascertain the authority of Schirmer, Perry, and other

alleged Principal agents.[27]   Additionally, a reasonable jury could conclude that imputation is inappropriate because the Trustees, First Priority, and the Delaware Valley colluded to take action adverse to Principal.  Official Comm. of Unsecured Creditors, 989 A.2d at 333, 338 (noting that a third party cannot rely on apparent authority when it colludes with an agent to the principal's detriment).  For these reasons, the court will adopt the magistrate judge's recommendation that First Priority and the Trustees are not entitled to summary judgment on Principal's material misrepresentation claim.

## C.   **Damages Claim**

Finally, First Priority and the Trustees object to the magistrate judge's recommendation to deny defendants' motions to the extent they seek summary judgment on Principal's claim to retain premiums.  (Doc. 178, at 33).  The magistrate judge found that Principal's complaint was not an action for rescission and therefore Principal could request the court to both declare the insurance policies as void or voidable and declare that Principal is entitled to retain premiums previously paid on the policies.  (Id. at 31).  First Priority and the Trustee's contend that an action for a declaratory judgment and a request for rescission are not mutually exclusive; "[r]ather, the first is a cause of action, and the second is a

---

[27]   A reasonable jury could also find that a diligent, prudent bank would review all insurance application materials before agreeing to provide premium financing and therefore First Priority should have known its loan agreement with the Trust violated Principal's corporate policy.  Of course, First Priority and Trustees can argue their loan was not a STOLI and did not violate Principal's prohibition, but as explained above that is a question for trial.

remedy." (Doc. 182, at 125).  They assert that Principal is seeking rescission as a remedy when it requests this court to declare that the policies void *ab initio*. (Doc. 182, at 23).  Furthermore, First Priority and the Trustee's contend that an insurer cannot rescind an insurance policy unless it returns the premiums paid on the policy.  (Doc. 182, at 125-27; Doc. 184, at 16).  Principal counters that it strategically chose to file a declaratory judgment action because "it does not wish to place the STOLI perpetrators" into their pre-contract position while it incurs substantial costs and expenses related to the policies and that substantial authority allows it to retain some or all of the premiums.  (Doc. 196, at 35).

In the instant case, Principal has filed a declaratory judgment action to determine its rights and obligations under the policies.  Principal requests to "retain some or all of the premiums paid on the DeRose policies as an *off-set* to the costs and expenses Principal Life has incurred as a result of the issuance of the policies."[28]  (Doc. 1, at 9) (emphasis added).  Assuming *arguendo* that Principal's request for the court to declare the contract void or voidable is in substance a request for rescission, Principal can nonetheless seek to retain some or all of the premiums paid on the polices as an off-set to the costs and expenses incurred as a

---

[28] Principal's complaint clearly requests only to retain premiums as an off-set to costs and expenses it incurred as a result of the issuance of the policies. Therefore, the court does not address whether Principal could retain premiums beyond the costs and expenses it incurred as a result of the issuance of the policies.

result of the issuance of the policies.[29]  As a general rule, when a contract is induced

by material misrepresentations a party must choose between alternative remedies:

"he may either rescind the contract or affirm it and maintain an action in deceit for

damages."  Mellon Bank Corp. v. First Union Real Estate Equity and Mortgage Inv.,

951 F.2d 1399, 1408 (3d Cir. 1991).  In the insurance context, a party seeking

rescission must return previously paid premiums.  Associated Elec. & Gas Ins.

Servs., Ltd. v. Rigas, 382 F. Supp. 2d. 685, 691 (E.D. Pa. 2004); LEE R. RUSS &

THOMAS F. SEGALLA, COUCH ON INSURANCE, § 32:63 (3d. Ed. 2011).  The rationale

behind the rule is that a remedy based on affirming a transaction is legally

inconsistent with a remedy based upon disaffirmance.  28A C.J.S. *Election of*

*Remedies* § 15 (2011).  It is not legally inconsistent, however, for a party to seek

consequential or special damages if rescission does not restore the plaintiff to his or

her former position.[30]  12A C.J.S. *Cancellation of Instruments; Rescission* § 171 (2011)

("[A] defrauded party who obtains rescission may recover special damages,

consisting of those expenditures made in reliance upon the misrepresentation, as a

part of the required restitution.").  Although using different terminology, the

Pennsylvania courts recognize this distinction.  See Boyle v. Odell, 605 A.2d 1260,

1265 (Pa. Super Ct. 1992) (observing that "in addition to granting equitable relief, in

---

[29]  The court rejects the magistrate judge's finding that "[i]t is clear that Principal
is not seeking rescission." (Doc. 178, at 32).  The court does not believe the issue is
clear, but concludes that the requested damages are permissible in either case.

[30]  Special damages are only permissible in the case of fraudulent
misrepresentations.  As explained above, a genuine issue of material fact exists as to
whether the misrepresentations on the POI were fraudulent.

the nature of rescission, the trial court is also empowered to grant the plaintiffs restitution of *appropriate losses incurred*" (emphasis added) (citations omitted)).  In Principal Life Insurance Co. v. Lawrence Rucker 2007 Insurance Trust, the court found that the insurer could recover costs and expenses incurred as a result of the issuance of a life insurance policy even after the policy was declared void *ab initio*. 774 F. Supp. 2d 674, 683 (D. Del. 2011); see also Lincoln Nat. Life Ins. Co. v. Snyder, 722 F. Supp. 2d 546, 564 (D. Del. 2011) (noting that a party seeking rescission may properly seek damages for expenses incurred).  Thus, whether labeled as special damages or restitution of appropriate losses incurred, Principal may seek to declare the policies void or voidable and seek to retain premiums as an off-set to expenses it occurred in the issuance of the policies.

**IV.    Conclusion**

The court will adopt the magistrate judge's recommendation to deny the Trustees' and First Priority's motions for summary judgment on the issue of whether Principal can declare the policies void or voidable because of misrepresentations made on the application.  The court also adopts the magistrate judge's recommendation to deny the defendants' motions for summary judgment on the issue of damages, but rejects the magistrate judge's reasoning.  The court rejects the magistrate judge's recommendation to deny defendants' motions for summary judgment on the issue of whether an insurable interest existed at inception.  The court holds that an insurable interest existed at inception as a matter of law.  Accordingly, the court grants the Trustees' and First Priority's

motions for summary judgment on the issue of whether an insurable interest

existed at inception.

An appropriate order is attached.


_S/ Christopher C. Conner_
CHRISTOPHER C. CONNER
United States District Judge


Dated:        October 5, 2011

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PRINCIPAL LIFE INSURANCE COMPANY,** | : | **CIVIL ACTION NO. 1:08-CV-2294** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MARK DeROSE, and MATTHEW DeRose, as Trustees of the JoAnn DeRose Family Trust, and FIRST PRIORITY BANK,** | : : : : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 5th day of October, 2011, upon consideration of the report of the magistrate judge (Doc. 178), wherein the magistrate judge recommends denying the motions for summary judgment (Docs. 104, 114) filed by defendants First Priority Bank ("First Priority") and Mark DeRose and Matthew DeRose, as Trustees of the JoAnn DeRose Family Trust ("the Trustees"), and upon further consideration of the parties' objections (Docs. 181, 183) thereto, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The report of the magistrate judge (Doc. 178) is ADOPTED in part and REJECTED in part as follows:

   a. The report is ADOPTED with respect to its recommendation to deny the motions for summary judgment on the issue of whether Principal Life Insurance Company ("Principal") can seek to have the policies declared void or voidable for material misrepresentations made on the application.

    b.    The report is ADOPTED with respect to its recommendation to deny the motions for summary judgment on the issue of whether Principal is entitled to retain premiums as an off-set to costs and expenses incurred as a result of issuing the policies.

    c.    The report is REJECTED in all other respects.

2.    The Trustees' and First Priority's motions for summary judgment (Docs. 104, 114) are GRANTED in part and DENIED in part as follows:

    a.    The motions are GRANTED with respect to the issue of whether Principal can seek to have the policies declared void or voidable for lack of an insurable interest.

    b.    The motions are DENIED in all other respects.

3.    The Clerk of Court is directed to defer entry of judgment until resolution of all issues.


        S/ Christopher C. Conner
        CHRISTOPHER C. CONNER
        United States District Judge